Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Scott E. Calvert (SBN 210787) *sc@mckennonlawgroup.com*
McKennon Law Group PC
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Jacob Valoff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB VALOFF,<br><br>               Plaintiff,<br><br>vs.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; and DOES 1 to 10, inclusive,<br><br>               Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>  -  Civil Cover Sheet;<br>  -  Summons; and<br>  -  Certification of Interested Parties] |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION AND VENUE

1.      Plaintiff Jacob Valoff ("Plaintiff") brings this action to recover benefits and to enforce and clarify his rights under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA section 502(e) and (f), 29 U.S.C. section 1132(e) and (f), and 28 U.S.C. section 1331.

2.      Venue lies in the Central District of California pursuant to ERISA section 502(e)(2), 29 U.S.C. section 1132(e)(2), because Plaintiff resides in this District, some of the breaches alleged occurred in this District and the ERISA-governed plan at issue was administered in part in this District.

## THE PARTIES

3.      Plaintiff is an individual who, at all times relevant to this action, was a citizen of the state of California and a resident of Orange County, California, City of Mission Viejo.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA section 3(7), 29 U.S.C. section 1002(7), in the employee welfare benefit plan established by his former employer JPMorgan Chase Bank, N.A. (the "Plan"), which is at issue in this action.

4.      Defendant The Prudential Insurance Company of America ("Prudential"), at all relevant times administered long-term disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number 50684 to JPMorgan Chase Bank, N.A. ("Chase").  That policy and the Plan

-1-

Case No.: 

1    promised to pay LTD benefits to Plaintiff should he become disabled.  Prudential,

2    has acted as a claims administrator and as an ERISA claims fiduciary of the Plan.

3

4        5.      The true names and capacities, whether individual, corporate, associate

5    or otherwise of the defendants named herein as DOES 1 through 10, inclusive, are

6    unknown to Plaintiff at this time, who therefore sue DOES 1 through 10 by fictitious

7    names and will ask leave of the Court to amend this Complaint to show the true

8    names and capacities of DOES 1 through 10 when the same are ascertained; DOES

9    1 through 10 are sued as principals and/or agents, servants, attorneys, and

10   employees of said principals, and all the acts performed by them were within the

11   course and scope of their authority and employment.  Plaintiff is informed and

12   believes and thereupon alleges that each of DOES 1 through 10 is legally

13   responsible in some manner for the events referred to herein, and directly and

14   proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

15

16                          **FACTUAL BACKGROUND**

17

18       6.      Plaintiff began working for Chase in or about July 2011.  At the time of

19   his disability, Plaintiff worked as a Personal Banker.  As a Personal Banker,

20   Plaintiff's primary job function was to stand in the bank lobby for the duration of his

21   shift, and greet, direct and assist customers.  He also occasionally needed to bend to

22   access cabinets or safety deposit boxes.

23

24       7.      Pursuant to the terms and conditions of the Plan, Plaintiff is entitled to

25   LTD benefits because he met and continues to meet, the Plan's operative definition

26   of "disability," and the other conditions necessary to qualify for LTD benefits

27   during the requisite time period.  The Plan provides that:

28

Case No.: 

You are disabled when Prudential determines that:

- you are unable to perform the ***material and substantial duties*** of your ***regular occupation*** due to your ***sickness*** or ***injury***; and
- you are under the ***regular care*** of a ***doctor***; and
- you have a 20% or more loss in your ***monthly earnings*** due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:

- you are unable to perform the duties of any ***gainful occupation*** for which you are reasonably fitted by education, training or experience; and
- you are under the regular care of a doctor.  (Emphasis in original.)

8.    The Plan states that:

***Material and substantial duties*** means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified.  (Emphasis in original.)

9.    The Plan defines "Regular occupation" as "the occupation you are routinely performing when your disability began.  Prudential will look at your occupation as it is normally performed instead of how the work tasks arc performed for a specific employer or at a specific location."

10.   In the Plan, "Gainful occupation" is defined as:

Case No.:



An occupation including self-employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds:

- 80% of your ***indexed monthly earnings*** if you are working; or
- 60% of your monthly earnings if you are not working.  (Emphasis in original.)

11.    Under the terms of the Plan, the Benefit Waiting Period is 182 days, after which Plaintiff is entitled to 60% of his monthly pre-disability earnings, which, based on his pre-disability salary, is approximately $1,925.00 per month.  The monthly benefit amount can be adjusted to account for other benefits received, and is payable until he reaches age 65, the maximum benefit period.  Plaintiff's date of birth is September 24, 1971.

12.    On or about October 1, 2011, while at work, Plaintiff bent at the waist to open the bottom drawer of a file cabinet and experienced immediate lower back pain with radiation down his right leg.  The pain caused significant issues with sitting, standing, bending and twisting.  Plaintiff sought treatment for his back pain through massage, and continued to work for a few days while suffering through the intense pain.  After experiencing severe back pain, coupled with back spasms for the next five days, he sought treatment at Mission Hospital Emergency Room at about 4 a.m. on Sunday morning.  Plaintiff received a shot in his back, Percocet and muscle relaxants, and was sent home.

13.    Eventually, Dr. Ahsan Rashid, who at that time was Plaintiff's primary care physician, ordered an MRI which showed a large herniated disc at L5-S1 and a disc protrusion at L4-L5.  On or about November 18, 2011, Plaintiff returned to work, taking Percocet and Vicodin five times daily for the pain.  Eventually, even

-4-



1    with the heavy pain medication, the pain became unbearable, so Plaintiff stopped

2    working and filed a Workers' Compensation claim.  Plaintiff's last day of work was

3    December 13, 2011.

4

5         14.     On January 5, 2012, Plaintiff was diagnosed with a herniated disc at

6    L4-L5 and L5-S1.  For the next few months, Plaintiff went to physical therapy.  In

7    February 2012, Plaintiff received lumbar epidural steroid injections at L4-L5 and

8    L5-S1.  On April 23, 2012, Plaintiff received another epidural steroid injection at

9    L5-S1.  However, as Dr. Peter Borden, a board-certified orthopaedic surgeon,

10    reported on May 16, 2012, the epidural steroid injections failed to provide

11    significant relief, and Plaintiff continued to experience significant neurological

12    deficits of the right lower extremity consistent with a large level two herniated disc.

13    An August 8, 2012 examination revealed decreased sensation in the right lower

14    extremity.

15

16         15.     However, when this conservative treatment failed to provide relief,

17    Plaintiff saw Sylvain Palmer, M.D., a neurosurgeon and spine specialist, for surgical

18    consultation.  Following his physicians' advice, he elected to undergo an LS-S1

19    microdiscectomy on August 29, 2012.

20

21         16.     Unfortunately, Plaintiff's problems continued even after the back

22    surgery.  For example, in a September 13, 2012 note, Dr. Palmer confirmed that

23    Plaintiff was still experiencing decreased sensation in his right foot.  In an October

24    11, 2012 record, Dr. Palmer noted that Plaintiff continued to experience numbness

25    and tingling.

26

27         17.     While Plaintiff continued to undergo physical therapy, he was not able

28    to return to a functionality that would facilitate a return to work.  Accordingly, his

Case No.:



physicians recommended that he submit to another MRI.  A February 8, 2013 MRI of the lumbar spine revealed a new right-sided laminectomy defect at L5-S1, and a diffuse disc bulge at the same level.  The MRI further revealed a central disc protrusion at L4-L5, as well as persistent periaortic lymph nodes.

18.   Upon further examinations, Plaintiff's physicians continued to note his ongoing pain and physical limitations.  On February 21, 2013, Dr. Palmer reported that Plaintiff continued to have "pain with disability."  On March 25, 2013, Dr. Palmer diagnosed Plaintiff with transverse myelitis, possible neoplasm and cervical spondylosis with possible myelopathy.  In light of these diagnoses, Dr. Palmer ordered another MRI.

19.   An April 1, 2013 MRI of Plaintiff's thoracic spine revealed multilevel spondylosis, with effacement of the ventral cord surface at T2-T3 and T7-T8.  An April 3, 2013 MRI of Plaintiff's cervical spine showed a cord lesion at C3, as well as multilevel spondylosis, with degenerative central canal and foraminal stenosis.

20.   Following an examination, on May 13, 2013, John Alevizos, D.O., noted that Plaintiff still complained of lower back pain, which worsened with standing or walking of more than 30 minutes.  In August 2013, Plaintiff reported to Dr. Alevizos that his pain remained, and his prescription for Percocet was refilled. Two months later, Plaintiff reported to Dr. Alevizos that he was experiencing pain in his left foot as well.

21.   After receiving Workers' Compensation benefits, Plaintiff applied for LTD benefits under the Plan.  Plaintiff submitted his claim by calling Prudential on January 3, 2014.  During that telephone call, Plaintiff explained that he last worked as a Personal Banker at Chase on December 13, 2011, when became unable to work

Case No.:



1    due to severe pain in his lower back through to his right foot.  When asked to

2    provide a diagnosis code for his condition, Plaintiff provided 724.2, which is the

3    code for lumbago.  Plaintiff also noted that he underwent a microdiscectomy on

4    August 29, 2012, and that he had received Workers' Compensation benefits from

5    Liberty Mutual because of his inability to return to work following the accident.

6

7         22.    On January 27, 2014, Prudential sent Plaintiff a letter acknowledging

8    his request for LTD benefits, and explaining that he would need to submit an

9    Attending Physician Statement and other medical records to support his claim.

10

11        23.    On or about February 5, 2014, Plaintiff submitted an Attending

12   Physician Statement completed by Dr. Alevizos.  On the form, Dr. Alevizos listed a

13   primary diagnosis of 722.10 (displacement of thoracic or lumbar intervertebral disc

14   without myelopathy).  Dr. Alevizos noted that Plaintiff would soon receive another

15   MRI of the lumbar spine, and that he "cannot stand or sit for longer than 30 minutes

16   at a time," he experiences "pain when walking" and has limited range of motion due

17   to the pain.

18

19        24.    On or about February 12, 2014, Chase submitted an Employer

20   Statement to Prudential.  In the form, Chase confirmed that Plaintiff was working as

21   a Personal Banker II, when he injured his lower back at work.  Prudential also

22   confirmed that Plaintiff's last day at work was December 13, 2011, and that he was

23   properly enrolled in the LTD Plan.

24

25        25.    Over the next two months, Plaintiff provided Prudential with medical

26   records related to his injury and subsequent disability.  This included a March 18,

27   2014 report from Michael Gilman, M.D., where Plaintiff complained of back pain at

28   10 or 10, as well as right foot pain.  At the time, Plaintiff was taking Percocet (for

Case No.:



1   pain) and Gemfibrozil and Lovastatin (for high cholesterol).  Given the past

2   findings, including diminished sensation, Dr. Gilman believed that Plaintiff was

3   suffering from recurrent disc herniation and right S1 radiculopathy.  Similarly, on

4   March 19, 2014, Dr. Borden noted global tenderness throughout the lumbar

5   paraspinal muscles at levels L4 through S1 and muscle spasms in the lower lumbar

6   spine.  Dr. Borden opined that Plaintiff was currently disabled and unable to return

7   to work.

8

9        26.    Despite the overwhelming medical evidence supporting Plaintiff's

10  claim for disability, by letter dated April 28, 2014, Prudential informed Plaintiff that

11  it was still "unable to make a determination on your claim at this time," and

12  requested additional time and information to make a claim decision.  In addition,

13  Prudential asked Plaintiff to complete an Activities of Daily Living Questionnaire.

14

15       27.    Plaintiff completed Prudential's Activities of Daily Living

16  Questionnaire form and submitted it on or about May 21, 2014.  In the form,

17  Plaintiff explained that he was unable to work due to "severe pain in lower back,

18  right hip (sciatica) and burning and shooting pain in right foot."  He also explained

19  that sitting on his right side caused unbearable pain.  Plaintiff then explained that, at

20  Chase, his job primary required standing in the bank lobby and greeting customers.

21  Plaintiff explained that extended standing caused his to experience pain in his lower

22  back, right hip and right foot.

23

24       28.    As requested by Prudential, Plaintiff then provided information

25  regarding his physicians and medications.  Plaintiff was taking Hydrocodone (an

26  opioid used for pain relief), tramadol (a narcotic used to treat moderate to severe

27  pain) cyclobenzaprine (for pain and muscle stiffness), gabapentin (a nerve pain

28  medication) and Gemfibrozil and Lovastatin (for high cholesterol).  Plaintiff further

Case No.:



explained that, in addition to the pain he experienced during the day, he also had difficulty sleeping as his pain made it difficult to fall asleep, and would wake him up in the middle of the night.  In addition, Plaintiff provided Prudential with additional medical records, including records form his Workers' Compensation claim.

29.     Eventually, Plaintiff was notified by letter dated January 9, 2015, that Prudential approved his claim for LTD benefits effective June 13, 2012.  Prudential explained that "we have reviewed the medical information provided by your treating physician and have determined that you are currently disabled from your regular occupation."

30.     Despite taking a year before finally approving Plaintiff's claim for LTD benefits, once those benefits were approved, Prudential immediately began searching for a way to deny Plaintiff's claim, and instructed MES to begin searching for a physician to conduct an Independent Medical Examination ("IME").

31.     Pursuant to Prudential's instruction, Plaintiff appeared for an IME with Dr. Kamran Hakimian on March 17, 2015.  Dr. Hakimian prepared a report the same day.  In the report, Dr. Hakimian noted that Plaintiff complained for low back pain, which ranged from anywhere from 2-8 out of 10 depending on the day, and also that Plaintiff reported only temporary relief from the Norco, Gabapentin and Tramadol.

32.     Asked to offer an opinion regarding Plaintiff's functional impairment, Dr. Hakimian reported that he believed Plaintiff could walk or stand for 30 minutes at a time for a total of three hours a day, and could sit for up to 8 hours a day, with 10 minute breaks once an hour.  While both Plaintiff and his treating physicians reported that Plaintiff was unable to sit without pain for more than 30 minutes at a time, Dr. Hakimian explained that he reached his conclusion because Plaintiff sat for



1   90 minutes during the examination.  (As noted below, Plaintiff disputes that he sat

2   for 90 uninterrupted minutes during the examination.  In addition, Dr. Hakimian

3   failed to explain why even 90 minutes of sitting was evidence that Plaintiff could sit

4   for 8 hours a day.)

5

6         33.     By letter dated June 2, 2015, Plaintiff was notified by Prudential that it

7   was denying his claim for LTD benefits effective June 1, 2015.  In the letter,

8   Prudential explained that, according the results of the IME, Plaintiff should be able

9   to sit for up to eight hours per day, and stand and walk for 30 minutes at a time, for a

10  total of three hours per day.  Prudential made no attempt to square these findings

11  with the contrary findings repeatedly offered by Plaintiff's treating physicians.

12  Instead, Prudential informed Plaintiff that with these (supposed) abilities, he should

13  be able to perform the gainful occupations of Credit Analyst, Loan Officer, Credit

14  Counselor and Personnel Recruiter, and was therefore no longer eligible for LTD

15  benefits.

16

17        34.     Plaintiff appealed the claim decision through his then counsel by letter

18  dated August 15, 2015.  In the appeal letter, Plaintiff noted that Prudential's entire

19  claim decision was based on the opinion of Dr. Hakimian that Plaintiff "could sit for

20  up to 8 hours per day and should be allowed 10 minutes for repositioning and

21  changing positions every hour."  Plaintiff explained that "this single statement is

22  false," and with the appeal submitted evidence "to refute that 'assumption' and to

23  provide evidence that the patent suffers from very high level of pain on a 24-hour

24  basis and is complete incapable of returning to work at a sedentary job."

25

26        35.     The appeal letter included and summarized updated medical records.

27  For example, in a July 16, 2015 medical record, Dr. Dominquez explained that

28  Plaintiff suffered from "low back and right foot pain … 100% of the time," and that

Case No.:



1  "aggravating factors include any increased activity, bending, walking or sitting too

2  long." Dr. Dominquez further explain that the pain causes "difficultly working,

3  sleeping, walking, sitting, job performance and exercise." In the letter, Plaintiff

4  explained that, despite the medication, Plaintiff "is unable to sit, stand or walk for

5  longer than 15-20 minutes without exacerbating his pain, and there needs 10-15

6  minute breaks every 25-30 minutes to alternate between sitting, standing or

7  walking." He also noted that while Plaintiff can sit for up to 30 minutes

8  continuously, he could not do that in a normal chair, but only "in an angled/reclining

9  couch that allows his back to be stretched out where the padding is soft and his feel

10  and be elevated." Dr. Dominquez further explained that his pain medication causes

11  sedation, fatigue and memory problems such as forgetfulness.

12

13      36.    In addition, the appeal letter included the February 24, 2015 record

14  prepared by Dr. Richard I. Woods as he examined Plaintiff for an Orthopaedic

15  Agreed Medical Examination. Dr. Woods, was not one of Plaintiff's treating

16  physicians, but rather preparing an *independent report* in connection with Plaintiff's

17  claim for Workers' Compensation benefits. After examining Plaintiff, Dr. Woods

18  offered the following diagnoses: right microlaminotomy and discectomy, L5-S1, for

19  large disc extrusion; residual or recurrent mild disc protrusion, L5-S1; mild to

20  moderate disc protrusion at L4-L5 and probable discogenic pain in the lower lumbar

21  spine. Dr. Woods also confirmed Plaintiff's lower back pain, noting that "sitting 30

22  minutes causes increased low back pain." He also noted decreased sensation in

23  Plaintiff's right leg and foot.

24

25      37.    The appeal letter also included the May 15, 2015 report of Andrew

26  Schreiber, M.D., another *independent physician* who conducted a nerve conduction

27  study as part of Orthopaedic Agreed Medical Examination. Dr. Schreiber's testing

28

Case No.:



and report revealed "moderate active denervation at right S1 innervated muscles" and "evidence of moderate acute S1 radiculopathy of the right [side]."

38.    In the appeal letter, Plaintiff also disputed the report of Dr. Hakimian, noting that Plaintiff did not and would not have informed Dr. Hakimian that he could sit for 8 hours a day, and further that such as question was not actually posed to him during the examination.

39.    In conclusion, Plaintiff explained that he was seen by three doctors who were not paid by Prudential, and all of whom spent more time evaluating Plaintiff than Dr. Hakimian did during the IME, and those doctors agreed that Plaintiff suffered from severe lower back pain that continues down from the LS-51 incision, through the buttocks and through the right hip and thigh, and suffers from constant burning and shooting pain in his right foot due to a documented radiculopathy and took powerful pain medication resulting in cognitive difficulties and sleep difficulties.  In light of the overwhelming evidence that Plaintiff was unable to return to work, Plaintiff asked Prudential to overturn its previous denial decision.

40.    Upon receipt of the appeal letter, rather than providing Plaintiff with a "full and fair review" of his claim as required by ERISA, Prudential began casting about for information that could be used to support its claims decision.

41.    First, Prudential enlisted Ethos Risk Services to conduct video surveillance of Plaintiff on September 3, 4 and 5, and also perform "Internet Mining" regarding Plaintiff.  However, during these three days, Plaintiff was not observed outside of his home.  This is consistent with Plaintiff's reported activities and restrictions and limitations.  Similarly, Ethos Risk Services reported to Prudential that the "Internet Mining" search returned "very minimal activity."



42.     Second, as part of the review of Plaintiff's appeal, Prudential asked Jamie Foland, M.D. to conduct a "paper review" of Plaintiff's medical records, and paid $5,231 for the report.  Dr. Foland prepared a report dated September 21, 2015. In the report, Dr. Foland reviewed and summarized Plaintiff's medical records. Then, Dr. Foland noted that "based on the information available for review," he believed "within a reasonable degree of clinical probability that the clinical evidence provided supports functional impairment due to the claimant's diagnoses of cervical and lumbar spondylosis."  Dr. Foland further confirmed that "the evidence supports the presence of functional impairment for which the claimant is in need of appropriate restrictions and limitations."  Dr. Foland then noted that the MRI results confirmed the existence of "an intrinsic mass within the spinal cord at C3," "moderate central spinal stenosis at C5/C6 and mild central spinal stenosis at C6/C7," "a 3 to 4 mm central disc protrusion at L4/L5," "3 mm diffuse disc bulge at L5/S 1," and "significant spondylosis manifested by moderate central spinal stenosis at C5/C6 and mild central stenosis at C6/C7."

43.     However, despite confirming these findings, Dr. Foland offered an opinion regarding Plaintiff's restrictions and limitations that differed from those offered by his treating physicians.  Ignoring the findings by Plaintiff's treating and independent physicians, Dr. Foland's opinion regarding Plaintiff's restrictions and limitations was based primarily on the statements of another physician paid by Prudential, Dr. Hakimian.  In addition, Dr. Foland stated that he did not believe that Plaintiff was suffering any side effects from the heavy pain medication he was taking, despite direct statements of Plaintiff's treating physicians to the contrary. Dr. Foland did not offer any support for this conclusion, other than the conclusory (but incorrect) statement that Plaintiff was not suffering adverse side effects from the medication.

Case No.:

44.     However, as Plaintiff later explained to Prudential, his examination with Dr. Hakimian did not even last for 90 minutes, and during most of that time, Plaintiff was not sitting still as Dr. Hakimian was performing his examination. (Indeed, it defies logic for Prudential to believe that during an examination that, per Dr. Hakimian's own report, included a review of his head, neck, cervical spine, upper extremities, lumbar spine and lower extremities, Plaintiff sat perfectly still for 90 minutes.)  Thus, the entire basis for Dr. Foland's conclusion that Plaintiff could sit for 90 minutes is baseless.

45.     Despite the fact that Dr. Foland's opinion was in direct contrast the conclusions offered by Plaintiff's treating physicians, Dr. Foland's report does not contain any indication that he attempted to contact those physicians to discuss his contrary findings.  Nor did Prudential provide Dr. Foland's opinion to Plaintiff's treating physicians for review and comment.

46.     Prudential also conducted an "LTD Employability Assessment" through Vocational Consultant Jocelyn Hutton, who referred evaluation to Professional Disability Associates for an employability assessment.  It was noted that the prior assessment by Paula Slager, VRC, falsely assumed that "Plaintiff could sit up to 8 hours in a day and should be allowed 10 minutes for a repositioning/stretching and changing positions every hour."  The analysis confirmed the occupations previously identified for Plaintiff, stating that they all could be performed seated or standing not to exceed 2 hours per day or 20 minutes at a time without taking a break.  However, these exceeded the restrictions and limitations that Plaintiff's doctors had given him.  Further, there is no indication as to why this assessment concluded that all or any of these occupations would allow Plaintiff to take 10 minutes for repositioning/stretching every hour.

47.     While Plaintiff provided ample additional information to support his LTD claim with the first appeal, Prudential notified him by letter dated September 30, 2015 that it was upholding its initial denial decision.  In the letter, Prudential provided a brief summary of the medical records that Plaintiff submitted in support of his claim, as well as Dr. Foland's "paper review" report.  Prudential then noted that, based on Dr. Hakimian's (disputed) report that Plaintiff was able to sit for more than 90 minutes during the IME, that it determined he had sedentary work capacity and could work as either Credit Analyst, Loan Officer, Credit Counselor and Personnel Recruiter.

48.     In upholding the denial decision, Prudential also offered Plaintiff another opportunity to appeal the claim decision.

49.     Following the September 30, 2015 denial of his claim for LTD benefits, Plaintiff took advantage of Prudential's offer of a second appeal.  In an April 8, 2016 letter, Plaintiff, through counsel, appealed Prudential's denial of his disability claims.  Plaintiff's appeal supplemented his claim LTD benefits with updated medical records, and explained that his condition and medical support were akin to those described and submitted when Prudential previously approved and pain his claim for LTD benefits.

50.     The April 8, 2016 letter first explained that while Prudential asserted that the medical records did not support Plaintiff's claim for benefits, that assertion was incorrect.  Plaintiff noted that the doctors who examined and treated him had determined that he was totally disabled due to a variety of conditions, including, but not limited to, severe low back pain, back spasms, myalgia and myositis, failed back syndrome of lumbar spine and degenerative disk disease.  Plaintiff further explained that his diagnoses were supported by a variety of MRI reports, X-Ray results and



EMG/nerve conduction studies.  In addition, Plaintiff's conditions and related restrictions and limitations were documented, not only by his treating physicians, but also independent physicians hired by the Workers' Compensation Appeals Board.

51.     In addition, with the appeal letter, Plaintiff also provided updated medical records to support his contention that he was disabled from June 2015 through the date of the appeal letter.  Plaintiff noted that the records prepared by Dr. Dominguez immediately before and after Prudential's June 2015 decision supported Plaintiff's contention that he was and has remained totally disabled since October 2011.  Indeed, the medical records revealed that Plaintiff's pain and overall condition were getting progressively worse, as expected given that his diagnoses are degenerative in nature.

52.     For example, on May 28, 2015, immediately before Prudential's June 2, 2015 denial decision, Dr. Dominquez again treated Plaintiff and noted that he complained of constant "low back pain, radiating pain into buttocks and radiating pain down one leg" and "right foot pain," and that the aggravating factors for this pain included "increased activity, bending, walking/sitting too long."  In addition, Dr. Dominguez noted that the pain limited Plaintiff's ability to walk, sit and lift. Based on this examination, past treatment and review of records, Dr. Dominguez diagnosed Plaintiff with post-laminectomy syndrome lumbar region (722.83), unspecified myalgia and myositis (729.1), lumbago (724.2), chronic pain due to trauma (338.21) and other chronic postoperative pain (338.28).  Dr. Dominguez prescribed Gabapentin, Norco and tramadol, with occasional doses of Flexeril and hydrocodone to help manage the pain, which was at 8-9 out of 10 without the medication, and still a 2-3 out of 10 with the medication.



53.     On June 22, 2015, Dr. Dominguez again noted that Plaintiff complained of constant "low back pain, radiating pain into buttocks and radiating pain down one leg" and "right foot pain," with the same aggravating factors including "increased activity, bending, walking/sitting too long."  Dr. Dominguez repeated the same diagnoses as during the previous visit.  He also noted that while Plaintiff's pain medication was the same as before, "he is unable to sit, stand or walk for longer than 20 minutes without exacerbating his pain" and "can sit up to 30-40 continuous minutes but only if it is in a reclining couch that allows his back to be stretched out and where the padding is soft."  Dr. Dominguez further explained that his medication "can cause occasional light sedation or fatigue."

54.     Plaintiff's next visit to Dr. Dominguez was on July 16, 2015.  During this visit, Dr. Dominguez noted that Plaintiff's complaints regarding the location and intensity of the pain were consistent with his previous reports.  The records also indicated that his diagnoses and medication regime were the same as before, however, the medication began causing "light sedation, fatigue and memory problems."  Furthermore, Dr. Dominguez's records reflect that Plaintiff was "unable to sit, stand or walk for longer than 15-20 minutes without exacerbating his pain and therefore he needs to take 10-15 minute breaks every 25-30 minutes to alternate between sitting, standing or walking."  He also noted that Plaintiff "can sit up to 30 continuous minutes but only if it is in an angled/reclining couch that allows his back to be stretched out and where the padding is soft and his feet can be elevated."

55.     During Dr. Dominguez's August 18, 2015 examination of Plaintiff, he reported "experiencing increased pain," with pain levels at 8-9/10 without the medication and an average of 4/10 with the medication.  Dr. Dominguez's records again reflect that Plaintiff remains "unable to sit, stand or walk for longer than 15-20 minutes without exacerbating his pain and therefore he needs to take 10-15 minute



breaks every 25-30 minutes to alternate between sitting, standing or walking" and that "he can sit up to 30 continuous minutes but only if it is in an angled/reclining couch that allows his back to be stretched out and where the padding is soft and his feet can be elevated." In addition, the medications "cause occasional light sedation, fatigue and memory problems, such as forgetting things," and that he "also experiences severe daytime fatigue and requires multiple resting breaks throughout the day."

56.     On October 15, 2015, Plaintiff again reported constant "low back pain, radiating pain into buttocks and radiating pain down one leg" and "right foot pain," and that the "aggravating factors" for this pain includes "increased activity, bending, walking/sitting too long." However, he also reported "experiencing increased pain in the past month," often needing his cane to walk around. Indeed, Plaintiff reported that his "pain has increased in the last 3-4 days" and "has gotten so severe that he has … to lay on his back for him to tolerate the pain." He noted that his average pain level with the current medication regimen is 7/10, and an 8-9/10 with decreased functionality without medication. Following this examination, Dr. Dominguez offered slightly different diagnoses than before:  failed back syndrome, lumbosacral (M96.1), muscle pain (M79.1), pain, chronic due to trauma (G89.21) and chronic postoperative pain (G89.28), with a medication regime of Gabapentin, Norco and tramadol. Despite this minor change in diagnoses, he did not change his opinion that he was disabled and unable to return to work.

57.     Following Dr. Dominguez's November 12, 2015 examination, Plaintiff reported that his pain without medication was slightly better, at a 6/10. However, he also reported "a severe spasm that has not responded to conservative massage and rest," and that there was "pain over the right lower lumbar region and extending to the midline," which limited his functionality. On examination, Dr. Dominguez

noted "severe tenderness over taut myofascial bands the muscle," with diagnoses of failed back syndrome, lumbosacral (M96.1), muscle pain (M79.1), pain, chronic due to trauma (G89.21) and chronic postoperative pain (G89.28).

58.     On January 7, 2016, Plaintiff again reported radiating low back pain and pain in his right foot, with the same aggravating factors noted above.  Plaintiff explained that he was experiencing increased pain and spasms, and reported that he went to the emergency room for treatment in December.  He also reported that the medication was not working as well as before.  Accordingly, his medication was changed with cyclobenzaprine, used to treat pain and stiffness caused by muscle spasms, added to the Gabapentin, Norco and tramadol he continued to take for pain. Dr. Dominguez also instituted a trial of Lyrica for the neuropathic pain.  Dr. Dominguez's diagnoses following this visit were:  failed back syndrome of lumbar spine (M96.1), muscle pain (M79.1), low back pain (M54.5) and chronic pain due to trauma (G89.21)

59.     Next, following Dr. Dominguez's February 4, 2016 examination of Plaintiff, he indicated that Plaintiff's lower pain back had increased and reached a severity level of 8/10, with the pain radiating into his buttocks and down one leg, and with the same aggravating factors noted previously.  With this increased pain, he was taking four different medications:  Gabapentin, Norco, tramadol and Lyrica. Dr. Dominguez's diagnoses were the same as during the previous visit:  failed back syndrome of lumbar spine (M96.1), muscle pain (M79.1), low back pain (M54.5) and chronic pain due to trauma (G89.21).

60.     Most recently, Plaintiff was examined and treated by Dr. Dominguez on March 3, 2016.  The medical report from that date was similar to the February 4,

-19-



2016 report, with Dr. Dominguez noting that adding the Lyrica has been helpful, but he had the same diagnoses and related restrictions and limitations.

61.    Additionally, as noted above, on December 23, 2015, Plaintiff was forced to go to the hospital because of overwhelming pain.  During that hospital visit, Dr. Minh V. Le diagnosed Plaintiff with back pain and acute sciatica.  Plaintiff was given a dose of dilaudid, which is a narcotic used to treat pain, and prescribed methylprednisolone, which is a steroid used to treat inflammation and flares of chronic illness.

62.    In addition to the submission of the additional medical information supporting the claim, Plaintiff also pointed out other ways in which the denial decision was deficient and contrary to the evidence.  First, Plaintiff explained why it was improper to rely on the deficient "paper reviews" prepared by Dr. Foland and Dr. Hakimian.  Next, Plaintiff noted that, as described above, the vocational review that Prudential relied upon was flawed, as it was based on conclusions regarding Plaintiff's capabilities that were contradicted, not only by Plaintiff's treating physicians, but also Dr. Woods (the independent physician who examined Plaintiff in connection with his Workers' Compensation) and Prudential's own paid physician, Dr. Hakimian.

63.    Plaintiff also noted that after concluding that he met the Plan's definition of Disability, Prudential failed to provide "substantial evidence" of improvement in Plaintiff's condition, which is required if an administrator initially approves a claim for benefits.  Applicable case law requires that substantial evidence must support a plan fiduciary's decision to terminate benefits in light of its initial finding of disability.  *See Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 871 (9th Cir. 2008) ("MetLife had been paying Saffon long-



term disability benefits for a year, which suggests that she was already disabled.  In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration"); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) ("Nothing in the claims record justified [the administrator's] decision that a change of circumstances warranted termination of the benefits it initially granted.").[1]

      64.    In the appeal letter, Plaintiff noted that Prudential approved Plaintiff's claim for LTD benefits beginning on June 13, 2012, yet later concluded that Plaintiff was no longer disabled as of May 31, 2015.  Yet, in the June 6, 2015 and September 30, 2015 denial letters, Prudential failed to provide *any*, let alone *substantial*, evidence of an improvement in Plaintiff's condition justifying its conclusion that Plaintiff was no longer disabled and capable of performing other gainful occupations.  Indeed, Plaintiff explicitly noted that his doctors diagnosed him with the same conditions and prescribed same treatments before and after May 31, 2015.  Further, they documented that his condition has worsened since the date of the denial.  Because Prudential could not and did not point to any medical

---

[1] In *Nolan v. Heald College*, 745 F. Supp. 2d 916, 936 (N.D. Cal. 2010), the district court rejected MetLife's argument that it "was entitled to terminate benefits despite no change in Nolan's condition."  Instead, the court explained that because the administrator failed to point to any "evidence suggesting that Nolan's condition had improved since it began paying benefits two years before.  Under Saffon, this 'suggests that she was already disabled,' and makes a reversal of MetLife's determination appropriate."  *Id.*  Similarly, in *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002), the Eighth Circuit noted that at the time of the denial decision, "Paul Revere had been paying benefits for some time, which suggests to us that Mr. McOsker was still totally disabled within the meaning of the relevant policy."  Given this, the court explained that "[w]e are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."  *Id.* at 589; *see also Fifield v. HM Life Ins. Co.*, 2012 U.S. Dist. LEXIS 140880, at *21 (D.N.H. 2012) (ruling it was improper for an administrator to determine that the claimant "was not disabled based on the same medical records that they deemed sufficient to support her disability" and the termination was not supported by "substantial evidence"

Case No.:

records to justified Prudential's decision to deny his ongoing LTD claim based on the very same conditions, restrictions and limitations that led Prudential to approve and continue to pay his LTD claim in the first instance.  Thus, Prudential's failure in explaining why it denied Plaintiff's benefits after his claim was previously approved constitutes additional evidence of impropriety.

65.     The appeal letter additionally explained that Prudential's previous denial letters improperly ignored the determination by the Workers' Compensation Appeals Board that Plaintiff was permanently disabled, and noted that in *Montour v. Hartford Life & Accident*, 588 F.3d 623, 630 (9th Cir. 2009), the Ninth Circuit criticized an ERISA administrator for failing to distinguish a contrary disability conclusion reached by a government entity.  Plaintiff noted that Prudential's failure to address his Workers' Compensation benefits award in its denial letters, despite clear knowledge of his award, suggests that it did not fully consider all of the evidence supporting his disability claim.

66.     Finally, Plaintiff explained that Prudential failed in its obligation to give him a full and fair review as required by ERISA and confirmed by the Ninth Circuit in *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011) and other cases.  As explained by the *Salomaa* court, in order to "conform to the claim procedure required by statute and regulation," Prudential was required to "explain, upon denial, any additional 'information needed'" to support a claim for benefits.  However, in violation of ERISA, Prudential failed to give Plaintiff's claim a full and fair review because it never explained to him what additional information was needed to satisfy the Plan's definition of disability.  By failing to do so, Prudential failed to engage in "a meaningful dialogue" with Plaintiff, as required by *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997) and other cases.

Case No.:



67.     Plaintiff also noted that the reports of Dr. Hakimian and Dr. Woods were approximately a year old, and because his overall condition had degenerated since those examinations, he would make himself available for an updated independent medical examination, functional capacity examination or other examination.

68.     Following the April 8, 2016 appeal letter, Plaintiff provided additional information to support his appeal and claim in a letter dated May 13, 2016.  That supplemental appeal letter included Dr. Dominguez's most recent medical record in which he offered explicit and unconditional support of Plaintiff's claim for LTD benefits

69.     In Dr. Dominguez's report dated April 21, 2016, he again explained that Plaintiff experiences pain in his lower back, radiating into his buttocks and down one leg.  He also noted that "aggravating factors" including "increased activity, bending [and] **walking/sitting too long**."  (Emphasis added.)  Dr. Dominguez then provided a brief history of Plaintiff's condition, explaining:

> Over the last two years, I have continued to treat Plaintiff for this back pain, and related issues.  During this time, the intensity of his pain has fluctuated slightly and I have made changes to his medication regimen to address his ongoing pain.  I have also reviewed a variety of MRI reports, X-Ray results and EMG/nerve conduction studies, **all of which support his complaints of pain, his diagnoses and related restrictions and limitations, and demonstrate his inability to return to work.**  (Emphasis added.)

Case No.:

70.     Dr. Dominguez then explained that, following Plaintiff's March 3, 2016 examination, he "diagnosed Plaintiff with failed back syndrome of lumbar spine (CPT Code M96.1), muscle pain (M79.1), low back pain (M54.5) and chronic pain due to trauma (G89.21)." He further noted that:

> It is my understanding that the insurance company denied Plaintiff's claim for disability insurance benefits, taking the position that his medical records did not demonstrate that he was unable to perform the duties of various sedentary occupations.  Specifically, a vocational consultant opined that he was able to work because he could sit for an extended period of time, as long as he changed positions once an hour. **I disagree with the conclusion that Plaintiff has sedentary work capacity, and could sit and work for such an extended period for of time, and then for eight hours a day, five days a week.** (Emphasis added.)

71.     Next, Dr. Dominguez explained that despite Prudential's conclusion, Plaintiff "does not have the capacity to sit uninterrupted for an hour before repositioning."  In conclusion, he stated that "I strongly disagree with any conclusion that Plaintiff has full-time work capacity, even in a sedentary position, as my consistent examinations of Plaintiff reveal that he is disabled and the requirements of a full-time position are well beyond his work capacity."  Dr. Dominguez's most recent medical record thus further confirmed the diagnoses detailed in Plaintiff's other medical documents, which fully support his entitlement to long-term disability benefits.

72.     As part of the second appeal, Prudential asked Jamie Lewis, M.D. to conduct a second "paper review" of Plaintiff's medical records.  Dr. Lewis prepared

Case No.:



two reports.  In the first report, dated April 26, 2016, Dr. Lewis prepared a summary of the medical records, and acknowledged that the MRI reports and Nerve Conduction studies confirm various conditions consistent with his reports of pain, including a cord lesion at C3, radiculopathy, a herniated disc, a disc bulge, a disc protrusion and moderate active denervation.  Dr. Lewis also notes that Plaintiff complained of constant pain, and that examinations showed diminished sensation, hypoactive reflexes, an antalgic gait and pain impacting his overall functional capacity.

73.     However, while she confirmed that the medical records show that Plaintiff has "medically necessary restrictions and limitations," Dr. Lewis believed that Plaintiff would return to full-time employments with the following restrictions: lifting, carrying, pushing and pulling 20 lbs. occasionally and 10 lbs. frequently, walking and standing 30 minutes continually and up to three hours cumulatively, sitting 60 minutes continually and up to six hours cumulatively and reaching overhead and below the wait occasionally.  While Dr. Lewis does reference Dr. Hakimian's report, she fails to offer any evidentiary support for the conclusion, and certainly does not explain why her conclusions differ from the physicians that examined and treated Plaintiff.

74.     With respect the Plaintiff's reports of being affected by the side effects of the medication, she states that there are no "cognitive examination findings" supporting Plaintiff's reports, but does not explain what tests/reports finding she believes would support his claims.  Nor does she state why she chose to ignore the reports by Dr. Dominquez that Plaintiff's pain medication causes sedation, fatigue and memory problems such as forgetfulness.

Case No.:



75.     Finally, Dr. Lewis reports that her conclusions are based on the "fact" that Plaintiff's pain levels are "down to 2-3/10 with his current medication regimen," despite Dr. Dominguez's February 4, 2016 report that Plaintiff's lower pain back had increased and reached a severity level of 8/10.

76.     Following Prudential's receipt of the information in the May 13, 2016 supplemental appeal letter, Prudential asked Dr. Lewis to review the additional information offered in support of the claim.  However, in a reported dated May 16, 2016, Dr. Lewis did not alter her opinion, and she reasserted that she believed that Plaintiff could engage in gainful employment within previously detained restrictions.

77.     Despite Plaintiff's medical records and evidence (summarized above) establishing his ongoing entitlement to LTD benefits, and the deficiencies in Prudential's denial of his claim detailed in Plaintiff's appeal letters, Prudential informed Plaintiff that it was denying his claims for disability benefits by letter dated June 7, 2016.

78.     In the final denial letter, Prudential explained that it was upholding its "decision to terminate [Plaintiff's] claim for LTD benefits."  After summarizing Plaintiff's medical records and its previous claims history, including the deficient vocational review, Prudential explained that it hired a different physician to conduct a "paper review" of Plaintiff's file, including the records provided with the appeal and supplemental appeal letters.  However, that physician, Jamie Lewis, M.D., did not give proper weight to Plaintiff's complaints that he could not sit for longer than 20 to 30 minutes, nor the records of Dr. Woods or Dr. Dominguez who confirmed that and similar restrictions and limitations.  Instead, Dr. Lewis chose to follow the disputed report of Dr. Hakimian that Plaintiff sat, unsupported, for 90 minutes.



79.     Prudential then stated that, based on the opinion of Dr. Lewis, it was standing by the opinion of its vocational reviewer that Plaintiff could perform four gainful occupations available in his labor market:  Credit Analyst, Loan Officer, Credit Counselor and Personnel Recruiter.  Prudential's June 7, 2016 denial letter stated that Plaintiff had the right to bring a legal action for benefits under ERISA section 502(a) following an adverse benefit determination on appeal.  While this conclusion was based on the assumption that Plaintiff had the ability to "stand/walk for 30 minutes for a total of 3 hours per day" and "sit up to 8 hours in a day and should be allowed 10 minutes for repositioning/stretching and changing positions every hour," that assumption was contrary to the medical evidence in the claim file.

80.     First, Dr. Woods explained that "sitting 30 minutes causes increased low back pain, at which time he has to rise."  This report is inconsistent with the conditions that the vocational consultant relied upon to conclude that Plaintiff could perform four gainful occupations which only allowed for repositioning once an hour, not once every 30 minutes as Dr. Woods said was necessary.

81.     Similarly, the restrictions and limitations repeatedly offered by Dr. Dominguez in his treatment records show that Plaintiff does not have the capacity to sit for an hour before repositioning.  For example, Dr. Dominguez listed "sitting too long" as an aggravating factor numerous times, including on 1/8/15, 3/5/15, 4/2/15, 4/30/15, 5/28/15, 6/22/15, 7/16/15, 8/8/15, 10/15/15, 11/12/15, 1/7/16 and 2/2/16. Further on 6/22/15, 7/16/15 and 8/8/15, Dr. Dominguez explained that Plaintiff "is unable to sit, stand or walk for longer than 15-20 minutes without exacerbating his pain and therefore needs to take 10-15 minute breaks every 25-30 minutes to alternate between sitting, standing or walking."  The need for a 10 to 15-minute break is well beyond the assumption by the vocational consultant that Plaintiff only needed to slightly change positions once an hour.  Indeed, on these same dates, Dr.



Dominguez noted that Plaintiff "experiences severe daytime fatigue and requires multiple resting breaks throughout the day." Finally, on both 7/16/15 and 8/8/15, Dr. Dominguez reported that for Plaintiff to sit for 30 continuous minutes requires "an angled/reclining couch that allows his back to be stretched out and where the padding is soft and his feet can be elevated." Importantly, these reports were made both before and after Consultant Hutton's August 2015 assessment, as well as before the second vocational consultant's review. Accordingly, it is clear that the assumption on which the second vocational consultant's based the conclusion that Plaintiff could sit for 8 hours a day, as long as he could change position once an hour is simply not supported by Plaintiff's primary treating physician.

82.   Finally, even Prudential's own paid physician, Dr. Hakimian, reported that Plaintiff was required to change positions more often than once an hour, and had to completely stop working during this time. Specifically, in noting that Plaintiff would need time for stretching and repositioning, Dr. Hakimian reported that Plaintiff "is not necessarily working during the time that his allotted for stretching and repositioning." There is no indication in Prudential's denial letter or the second vocational consultant's report that these occupations would allow Plaintiff to repeatedly stop working for an extended period of time during the day to stretch. This is a major imposition on an employer, and there is no indication that Consultant Hutton accounted for this accommodation. Even more importantly, while the second vocational consultant's opinion is based on the finding that Plaintiff would only need to stop working once an hour, Dr. Hakimian reported that Plaintiff "should be allowed these breaks on an **as-needed basis**."[2] (Emphasis added.) Given the reports by Dr. Woods and Dr. Dominguez, it is apparent that for

---

[2] Further, as noted above, to the extent that Consultant Hutton's opinion is based on Dr. Hakimian's statement that Plaintiff was able to sit, unsupported for 90 minutes, Plaintiff vigorously disputes that representation and conclusion.

Case No.:



Plaintiff "an as-needed basis" is more often than once an hour as Prudential assumed.

83. Finally, in the denial letter, Prudential, *for the first time*, acknowledged Plaintiff's receipt of Workers' Compensation and Social Security Disability Benefits. However, rather than explicitly distinguishing those decisions as required by *Montour*, *supra*, Prudential simply dismissed those decisions in a conclusory manner, stating that while those entities determined that Plaintiff was disabled, Prudential reached its own determination based on the terms of the group insurance policy.

84. Additionally, Prudential's final denial letter again failed to clarify what sort of medical evidence, treatment or test results were necessary to prove Plaintiff's symptoms, or what functional effects were necessary or sufficient to show his impairments reached a level which was disabling is improper. Similarly, Prudential again failed to provide Plaintiff with any details as to what medical documentation was missing, why the evidence in the record did not support his claim, or which plan provisions it relied upon to deny his claim. Accordingly, Prudential again failed to engage Plaintiff in a "meaningful dialogue" as required by *Salomaa*, *supra*.

85. Prudential's June 7, 2016 denial letter confirmed that Plaintiff exhausted his administrative remedies, and that, under ERISA, he was eligible to file a lawsuit seeking policy benefits and attorneys' fees.

86. The proper standard of review is de novo. Prudential does not have discretionary authority pursuant to California Insurance Code Section 10110.6, and it erred in denying Plaintiff's claim. California Insurance Code Section 10110.6 states in the relevant part:

Case No.:



(a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

(b) For purposes of this section, "renewed" means continued in force on or after the policy's anniversary date.

(c) For purposes of this section, the term "discretionary authority" means a policy provision that has the effect of conferring discretion on an insurer or other claim administrator to determine entitlement to benefits or interpret policy language that, in turn, could lead to a deferential standard of review by any reviewing court.

...

(g) This section is self-executing. If a life insurance or disability insurance policy, contract, certificate, or agreement contains a provision rendered void and unenforceable by this section, the parties to the policy, contract, certificate, or agreement and the courts shall treat that provision as void and unenforceable.

87.     This section, by its own terms, applies to any policy or agreement that provides "disability insurance coverage" to "any California resident" regardless of where it was offered, issued, delivered, or renewed.  Here, no party disputes that Plaintiff is a California resident.  As such, this section applies to the Policy and Plan at issue so long as they were offered, issued, delivered, or renewed after the effective date of the statute, which is January 1, 2012, but before Plaintiff's claim accrued.  *See Gonda v. The Permanente Med. Grp., Inc.*, 2014 WL 186354, at *2 (N.D. Cal. Jan. 16, 2014).  No party disputes that Plaintiff's claim accrued on August 15, 2015, which is the date on which his claim for disability benefits was first denied.  *See Grosz–Salomon v. Paul Revere Life Ins.*, 237 F.3d 1154 (9th Cir. 2001) (holding that an ERISA cause of action based on a denial of ERISA benefits accrues at the time benefits are denied).

Case No.:



88.     Thus, the only issue is whether the policy was offered, issued, delivered, or renewed on or after January 1, 2012, but before August 15, 2015.  For the purposes of section 10110.6, a policy automatically renews every year on the policy's anniversary date.  *See* Cal. Ins. Code §10110.6(b) (providing that "renewed" means "continued in force on or after the policy's anniversary date"). Here, the Policy became effective on January 1, 2011.  This means the Policy's renewal date falls within the relevant time period, as the policy continued in force through January 1, 2012 and renewed annually.  *See Gonda, supra* at 1093-1094; *Polnicky v. Liberty Life Assur. Co. Of Boston*, 999 F. Supp. 2d 1144, 1148 (N.D. Cal. 2013) (applying de novo standard of review to ERISA claim for denial of benefits because "[t]he Policy was continued in force after its January 1, 2012 anniversary date, [so] any provision in the Policy attempting to confer discretionary authority to Liberty Life was rendered void and unenforceable").  As such, any grants of discretion that can be deemed to be a part of the Policy are void and unenforceable, and thus, the denial of benefits at issue must be reviewed de novo.

89.     In a de novo review, "the burden of proof is placed on the claimant" to establish entitlement to plan benefits.  *Muniz v. Amec Const. Mgmt., Inc*., 623 F.3d 1290, 1294 (9th Cir. 2010).  "When conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Id.* at 1295-96.  The trial court performs an "independent and thorough inspection" of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits.  *Silver v. Executive Car Leasing Long–Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).  De novo review permits the trial court to "evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney v. Standard Ins. Co*., 175 F.3d 1084, 1095 (9th Cir.1999).

Case No.:



90.     Regardless of the standard of review this Court applies, Prudential reached an incorrect decision given the ample medical evidence in support of Plaintiff's disability.  Prudential's denial letters failed to address the overwhelming medical evidence supporting Plaintiff's continued claim for disability benefits, improperly relied on flawed "paper review" reports, ignored Plaintiff's limitations and inability to perform the four "gainful occupations" Prudential stated he could perform, failed to offer "substantial evidence" of improvement after initially approving the claim, failed to distinguish the Workers' Compensation Appeal Board's determination that Plaintiff was permanently disabled and failed to engage in a "meaningful dialogue" with Plaintiff regarding what additional medical evidence was needed to support his claim.  Accordingly, Prudential conducted a biased claims investigation consistent with its inherent conflict of interest that failed to provide Plaintiff with a full and fair review of his claim, in violation of ERISA.

91.     Plaintiff is now, and at all times relevant, remained "disabled" as defined in the Policy, and has now and at all times relevant convincingly demonstrated his total disability through medical records and other documents, information, and correspondence.

92.     Prudential's June 7, 2016 denial letter stated that Plaintiff exhausted his administrative remedies under the Plan and had the right to bring a legal action for benefits under ERISA section 502(a) following an adverse benefit determination on appeal.

## **FIRST CLAIM FOR RELIEF**

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest
under ERISA Plan – 29 U.S.C. sections 1132(a)(1)(B), (g)(1)
(Plaintiff against Prudential and Does 1 through 10)

Case No.:



93.     Plaintiff incorporates the previous paragraphs as though fully set forth herein.

94.     ERISA section 502(a)(1)(B), 29 U.S.C. section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

95.     At all relevant times, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for LTD benefits under the Plan, and by related acts and omissions, Prudential violated, and continues to violate, the terms of the Plan and Plaintiff's rights thereunder.

96.     Prudential failed to follow even the most rudimentary claims processing requirements of ERISA and the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. section 1133(2).  Thus, even if the Plan vests discretion in Prudential to make benefit determinations, no deference is warranted with regard to Prudential's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

97.     A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. §1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. section 1104(a)(1).  Under ERISA: (1) a



fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants, or its beneficiaries.  Prudential's handling of Plaintiff's disability benefit claim falls far short of these standards.

98.     For all the reasons set forth above, the decision to deny disability insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan and contrary to law. Prudential abused its discretion in deciding to deny this claim as the evidence shows its denial decision was arbitrary and capricious.  Further, Prudential's denial decision and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Prudential's denial of Plaintiff's claim constitutes an abuse of discretion as evidenced by, but not limited to, the following conduct:

- Ignoring the opinions of Plaintiff's treating physicians, all of whom maintained that Plaintiff is unable to return to work.  Deference should be given to these physicians' opinions as there are no specific, legitimate reasons for rejecting these physicians' opinions which are based on substantial and objective evidence in the claim file;

- Relying on the disputed reports of the IME physician regarding Plaintiff's alleged ability to sit for an extended period of time, despite repeated denials from Plaintiff, and failing to require Plaintiff to appear

Case No.:



for a functional capacity evaluation or similar testing to resolve the dispute;

- Relying on "paper reviews" conducted by its obviously biased physicians who issued opinions contrary to Plaintiff's treating physicians, and who ignored their statements regarding Plaintiff's disability. The paper reviewers ignored and downplayed the findings of both Plaintiff's treating physicians and other independent physicians regarding his functional limitations so as to reach a finding that he was not disabled;

- Relying on flawed vocational reviews which incorrectly determined Plaintiff was capable of working in a variety of occupations, the physical requirements of which were beyond his abilities given the restrictions and limitations detailed by this treating physicians;

- Failing to make a "full and fair" assessment of claims and to clearly communicate to Plaintiff the "specific reasons" for his benefit denials;

- Not engaging in "meaningful dialogue" with Plaintiff. Prudential was obligated to, but failed to, state in plain language what additional evidence it needed and what questions it needed answered so that Plaintiff could provide the additional material and information; and

- Failing to comply with ERISA's procedural requirements providing a full and fair review.

Case No.:



99.   As a direct and proximate result of Prudential's denial of disability benefits, Plaintiff has been deprived of LTD benefits from and after June 1, 2015.

100.   As a direct and proximate result of the denial of his claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action, and is entitled to reimbursement of these fees pursuant to 29 U.S.C. section 1132(g)(1).

101.   A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits.  Plaintiff seeks the declaration of this Court that he meets the Plan definition of disability, and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim consistent with the terms of the Plan.

102.   Plaintiff alleges all of the same conduct against Does 1 through 10 as it does against Prudential in this First Claim for Relief and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.   For all Plan benefits due and owing Plaintiff, including LTD benefits;
2.   For costs and reasonable attorneys' fees pursuant to 29 U.S.C. section 1132(g);
3.   For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship*

Case No.:



1    *v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir.

2    2007) ("A district court may award prejudgment interest on an award of

3    ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*,

4    977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest

5    at the rate of 10% per annum, pursuant to California Insurance Code

6    section 10111.2; and

7    4.    For such other and further relief as this Court deems just and proper.

8

9    Dated:  August 17, 2016                McKENNON LAW GROUP PC

10

11   By:

12         ROBERT J. McKENNON
           SCOTT E. CALVERT
           Attorneys for Plaintiff Jacob Valoff

-37-                                                        Case No.: